UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:09-CT-3135-BO

| | |
|---|---|
| GERALD WAYNE HANNAH, ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | O R D E R |
| ) | |
| UNITED STATES OF AMERICA, ) | |
| Defendant. ) | |

Gerald Wayne Hannah ("plaintiff" or "Hannah") filed this action pursuant to the Federal Tort Claims Act ("FTCA"). The United States of America is now before the court with a motion for summary judgment. Plaintiff responded in opposition, and the matter is ripe for determination.

The case arises out of the following as stated in two prior orders:

Plaintiff's contentions are that he suffers from chronic pain due to a variety of serious medical issues (MRSA, Hepatitis C, bronchitis, sinusitis) and as such is administered prescription pain medication through a patch. In 2005, the medication was once covered with Tegaderm. The cover caused a blister to appear at its location. Because of the allergic reaction, the Tegaderm cover was removed. Thereafter, the medical records indicate this allergy to the Tegaderm patch. (see medical records attached to compl.)

On July 4, 2008, Nurse Chapman explained to plaintiff she would not administer the pain medication without using Tegaderm. [The parties agree that Plaintiff's chronic care physician, Dr. Mercado, had ordered the use of Tegaderm.] Plaintiff explained he was allergic to Tegaderm and that the information was in his medical records. However, the nurse stated it was Tegaderm or nothing, and that plaintiff would be administered no pain medication until the following Monday (this was a Friday). Because of the amount of pain plaintiff was in, he saw no option, but to agree. The Tegaderm cover was applied, plaintiff felt a burning sensation, and again resulted in a blister. The cover was removed the next day by Mr. Connors. Mr. Connors also treated the blister and subsequent wound. Plaintiff contends the wound became infected and did not heal for over a month. (information taken from D.E. # 1, # 2, and # 20)

(D.E. # 25, Order Denying Motion to Dismiss; D.E. # 35, Order Denying Second Motion to Dismiss)

Summary judgment is appropriate when, after reviewing the record taken as a whole, no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in its pleading, Anderson, 477 U.S. at 248–49, but "must come forward with specific facts showing that there is a genuine issue for trial," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis and quotation omitted). A trial court reviewing a motion for summary judgment should determine whether a genuine issue of material fact exists for trial. Anderson, 477 U.S. at 249. In making this determination, the court must view the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. Scott v. Harris, 550 U.S. 372, 378 (2007).

Defendant previously sought dismissal of the case on grounds that the complaint was untimely and for failure to comply with North Carolina's pre-filing requirement Rule 9(j) in medical malpractice claims. (D.E 13 and 26) As previously held by this court, the matter was found to have been timely filed and dismissal was denied on that basis. (D.E. 25) Furthermore, this court held that this an ordinary negligence case based on the doctrine of res ipsa loquitur and

2

thus dismissal was also inappropriate based on Hannah's failure to comply with North Carolina's pre-filing requirement Rule 9(j). (D.E. 25 and 35)

"Actionable negligence occurs when a defendant owing a duty fails to exercise the degree of care that a reasonable and prudent person would exercise under similar conditions, or where such a defendant of ordinary prudence would have foreseen that the plaintiff's injury was probable under the circumstances." Martishius v. Carolco Studios, Inc., 355 N.C. 465, 473, 562 S.E.2d 887, 892 (2002) (citations omitted). Furthermore, a patient who fails to adhere to a regimen to maintain health can be held negligent. McGill v. French, 333 N.C. 209, 220, 424 S.E.2d 108, 114–15 (1993) (patient's failure to keep appointments and report symptoms to treating physician, occurring simultaneous with treating physician's negligence, constituted contributory negligence); cf. Powell v. Shull, 58 N.C. App. 68, 77, 293 S.E.2d 259, 264 (patient's failure to keep appointments with treating physician did not constitute contributory negligence when failure occurred after doctor's negligent treatment), disc. review denied, 306 N.C. 743, 295 S.E.2d 479 (1982).

The affidavits of Maitee Serrano-Mercado, M.D. and Kenneth Bryan, PharmD add the necessary understanding of the facts to resolve the issue now before this court at summary judgment. Kenneth Bryan is a pharmacist employed with the United States Bureau of Prisons (BOP) and specifically at Federal Medical Center Butner (FMC - Butner), since September 2008. (Byran Affidavit ¶ 1). Bryan has been the Chief Pharmacist at FMC Butner since June 2011. (Id.). Dr. Serrano-Mercado is a primary care physician employed by the BOP and specifically the Federal Correctional Complex at Butner from 2007 to 2011. (Serrano-Mercado Affidavit ¶ 1).

3

In the past during periods of Hannah's incarceration, Hannah had been prescribed the Fentanyl patch for pain management. (Id.). "Fentanyl is a Schedule II, opioid narcotic analgesic. The Fentanyl patch contains Fentanyl in gel form which the patch releases slowly over a 72 hour period of time. The gel is absorbed through the skin into the bloodstream." (Id. ¶ 3). "Fentanyl is a dangerous drug and is valuable in a penal setting as both a weapon and as a recreational agent. The patch contains a concentrated amount of the narcotic. It can be used to disorient or disable healthcare providers, correctional staff and/or other inmates. It, also, produces the characteristic narcotic high." (Mercado Affidavit ¶ 3; see also Bryan Affidavit ¶ 7). The Fentanyl patch can be dangerous to the wearer if he tampers with the patch and accelerates the rate of drug delivered to his bloodstream. (Bryan Affidavit ¶ 5; Mercado Affidavit ¶ 9).

Fentanyl must be strictly controlled. (Mercado Affidavit ¶ 3). The BOP safeguards the patients who wear the patch and its staff and other inmates from the dangerous properties of the Fentanyl patch by requiring that Tegaderm be applied over the top of the Fentanyl patch. (Mercado Affidavit ¶ 3; Bryan Affidavit ¶ 6). Tegaderm is thin, like onion skin, and virtually impossible to unstick it from itself once it is peeled and pucker. (Id.). This alerts BOP staff to tampering. (Id.).

Prior to July 2008, on May 11, 12, and 13, 2008, Dr. Serrano-Mercado prescribed the Fentanyl patch for Hannah. (Id.). Hannah was an in-patient at the Federal Medical Center hospital from May 12-22, 2008, and returned to FCI-II on May 22, 2008. (Id. and Ex. 2). On June 23, 2008, she also prescribed the Fentanyl patch for Hannah. (Mercado Affidavit ¶ 4). In July 2008, Dr. Mercado became Hannah's primary care physician. (Id.).

4

In July 2008, Hannah was housed in the FCI-II which is an open compound. (Mercado Affidavit at ¶ 7). During the same period of time, the FCI-II nurses informed Dr. Mercado of their suspicions that Hannah's Fentanyl patch appeared to have been tampered with on several occasions. (Id. ¶ 5). Tampering is difficult to prove, however, because the suspicion was strong, and the potential of danger to staff and other inmates was "so great" Dr. Mercado "followed FCC Butner policy and ordered the Fentanyl patch used on inmate Hannah be covered with Tegaderm." (Id.).

Dr. Mercado recalls that a nurse called her about Hannah's claim that he was "allergic" to Tegaderm. (Id. at ¶ 6). She therefore reviewed the BOP's electronic medical records (BEMR) and found no notation of allergy to Tegaderm. (Id.).

Dr. Mercado states that Hannah's claim of a blister is not an allergic reaction and it is not a contraindication to prescribing Tegaderm. (Id. at ¶ 7). Dr. Mercado states that she ordered the application of Tegaderm, based on the suspicion of tampering, to protect the staff and other inmates from the significant danger presented by the concentrated opioid narcotic and that a blister does not outweigh this grave danger. (Id. at ¶¶ 5, 12). Further, if Hannah did have a true allergy to Tegaderm, the FCI-II had 24 hour emergency medical services to address the situation. (Id. at ¶ 7).

Hannah claims that prior to July 4, 2008, his Fentanyl patch was covered with paper tape and secured by the nurse's initials. (Id. at ¶ 3; D.E. # 3). A nurse's initials on the exterior face of paper tape does not "secure" or provide a mechanism for BOP staff to determine if the inmate has tampered with the tape. (Id.). Paper tape, like other tape, can be painstakingly peeled up and

5

reapplied to the skin by someone with infinite time on his hands without any evidence that it has been uprooted from its initial application to the skin. (Id.).

Hannah also asserts that Tegaderm was applied over his PICC line in January 2012 and that he developed a rash on his arms and legs two weeks later. (DE #23, ¶¶ 7, 10). Dr. Mercado explains that a PICC line is a tube placed in an extremity, usually an arm, which delivers medication close to the heart. (Mercado Affidavit ¶ 10). Hannah did not report a blister under the Tegaderm when placed over his PICC line in the FMC. (DE # 23, ¶ 7). Tegaderm is a topical agent and reactions appear at the site where it is affixed to the skin via its adhesive close to the time of application. (Mercado Affidavit ¶ 10; Bryan Affidavit ¶ 11). Hannah reports a rash down his arms and legs, two weeks later. (Id.). This is a reaction to the medication being administered via the PICC line, not a reaction to the Tegaderm. (Mercado Affidavit ¶ 10; Bryan Affidavit ¶ 11; see DE # 23, ¶ 10).

Further, Hannah claims that on July 5, 2008, the day after the nurse applied Tegaderm over his Fentanyl patch, a paramedic in FCI-II medical removed the patch and Tegaderm and the "whole Tegaderm Fentanyl Patch was one large burn-blister[.]" (DE # 2, ¶¶ 34 – 44). Since the Tegaderm overlays the Fentanyl patch with only small margins (a few millimeters) of Tegaderm in contact with the skin, inmate Hannah's recitation of facts suggests that he was "reacting" to the Fentanyl, not to the Tegaderm. (Mercado Affidavit ¶ 8). Skin irritation is a known side effect of Fentanyl. (Id.; Bryan Affidavit ¶ 8). Though not consistent with an allergic reaction, Hannah's account of a blister under the whole Fentanyl patch is consistent with tampering with the patch. (Mercado Affidavit ¶ 9; Bryan Affidavit ¶ 9). The July 5, 2008 paramedic's note confirms that Hannah did not experience an allergic reaction or exhibit any signs of infection. (DE # 2-1, p. 5).

6

The paramedic does not document any skin redness or other discoloration, swelling, elevated skin temperature, oozing or pus – signs which medical personnel are trained to look for and to document. (Mercado Affidavit ¶ 8).

Lastly, Dr. Mercado was Hannah's primary care physician after July 5, 2008. (Mercado Affidavit ¶ 11). She does not recall treating Hannah for a "blister, burn or other scarring from a 'burn-blister.'" (Id.). Dr. Mercado also notes that in reviewing the medical records for drafting the affidavit now before the court, she notes that on July 5, 2008, an entry was made in the electronic medical records noting "allergy to Tegaderm - blister." (Id. ¶ 6). She continues that July 5, 2008, was the day the paramedic saw Hannah and documented the blister and documented "pharmacy notified." (Id.). Notification to the pharmacy would have led to the medical records entry. (Id.) Dr. Mercado states that "assuming that inmate Hannah's recitation of facts is accurate and the nurse told me that inmate Hannah claimed a blister as an allergic reaction, I would not have considered this to be an allergic reaction and I would have ordered the nurse to apply the Tegaderm on the Fentanyl patch." (Id.).

In the matter before the court, no negligence has been shown. The medical staff owing a duty to Hannah did exercise the degree of care that a reasonable and prudent person would exercise under similar conditions. Hannah was receiving powerful and dangerous medication and it was being provided and monitored in the safest and most effective way in the prison setting. Furthermore, it was not foreseeable that the Tegaderm would cause any harm to Hannah as no medical records, at the moment the Tegaderm cover was applied, suggested any allergy to the application.

7

Case 5:09-ct-03135-BO   Document 43   Filed 09/06/12   Page 7 of 8

Summary judgment is GRANTED for defendant (D.E. # 36), and the Clerk is DIRECTED to CLOSE the case.

SO ORDERED, this the 5 day of September 2012.

*Terrence Boyle*
TERRENCE W. BOYLE
UNITED STATES DISTRICT JUDGE

8